**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

FEDERAL TRADE COMMISSION,

　　　　Plaintiff – Appellee,

v.

ACCUSEARCH INC., d/b/a Abika.com;
JAY PATEL,

　　　　Defendants – Appellants,

---

JENNIFER STODDART, Privacy
Commissioner of Canada,

　　　　Amicus Curiae.

No. 08-8003
(D.C. No. 2:06-CV-00105-WFD)

---

**JUDGMENT**

---

Before **HARTZ**, **TYMKOVICH** and **HOLMES**, Circuit Judges.

---

This case originated in the District of Wyoming and was argued by counsel.

The judgment of that court is affirmed.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

June 29, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENNTH CIRCUIT

---

FEDERAL TRADE COMMISSION,

        Plaintiff - Appellee,

    v.

ACCUSEARCH INC., d/b/a
Abika.com; JAY PATEL,

        Defendants - Appellants,

_____

JENNIFER STODDART, Privacy
Commissioner of Canada,

      Amicus Curiae.

No. 08-8003

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 2:06-CV-00105-WFD)**

---

Deborah L. Roden (Gay Woodhouse with her on the briefs) of Gay Woodhouse
Law Office, P.C., Cheyenne, Wyoming, for Defendants - Appellants.

Lawrence DeMille-Wagman, Attorney, Federal Trade Commission, Washington,
D.C., (William Blumenthal, General Counsel, John F. Daly, Deputy General
Counsel for Litigation, Federal Trade Commission, Washington, D.C.; and Tracy
S. Thorleifson, Kial S. Young, Federal Trade Commission, Seattle, Washington,
with her on the brief), for Plaintiff - Appellee.

Edward R. McNicholas, Sidley Austin LLP, Washington, DC, filed an amicus
curiae brief for Jennifer Stoddart, Privacy Commissioner of Canada, in support of
Plaintiff - Appellee.

---

Before **HARTZ**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Abika.com is a website that has sold various personal data, including telephone records. The Federal Trade Commission (FTC) brought suit against the operator of the website, Accusearch Inc., and its president and owner, Jay Patel (collectively, Accusearch), to curtail Accusearch's sale of confidential information and to require it to disgorge its profits from the sale of information in telephone records. The FTC alleged that Accusearch's trade in telephone records (which are protected from disclosure under § 702 of the Telecommunications Act of 1996, 47 U.S.C. § 222 (2006)) constituted an unfair practice in violation of § 5(a) of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(a) (2006). The district court granted the FTC summary judgment, *see FTC v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786, at *10 (D. Wyo. Sept. 28, 2007), and after further briefing entered an injunction restricting Accusearch's future trade in telephone records and other personal information.

On appeal Accusearch contends that (1) the FTC's unfair-practice claim should have been dismissed because Accusearch broke no law and because the FTC had no authority to enforce the Telecommunications Act; (2) it was immunized from suit by the protections provided websites in the Communications

-2-

Decency Act (CDA), 47 U.S.C. § 230 (2006); and (3) the injunction is unnecessary to prevent it from resuming trade in telephone records and is unconstitutionally overbroad. Exercising jurisdiction under 28 U.S.C. § 1291, we reject each of Accusearch's contentions and affirm. First, conduct may constitute an unfair practice under § 5(a) of the FTCA even if it is not otherwise unlawful, and the FTC may pursue an unfair practice even if the practice is facilitated by violations of a law not administered by the FTC, such as the Telecommunications Act. Second, Accusearch's claimed defense under the CDA fails because it acted as an "information content provider" (and thus is not entitled to immunity) with respect to the information that subjected it to liability under the FTCA. *See* 47 U.S.C. § 230(f)(3). Finally, the injunction was proper despite Accusearch's prior halt to its unfair practices and the possibility that the resumption of those practices would be criminally prosecuted; and Accusearch waived in district court its claim on appeal that the injunction is overbroad.

## I.      BACKGROUND

### A.      Abika.com

Although the parties characterize the Abika.com website differently, they do not dispute the essential aspects of its operation. Any person interested in Abika.com's services could access the website through a search engine or by typing its address into an Internet browser. A visitor to the website would first see its homepage, which displayed various categories of information that could be

searched. The record contains one printout of the website from December 20, 2006, and one from November 27, 2007. The printouts show that some searches advertised on the homepage targeted information generally contained in government records, such as "court dockets," "sex offender records," and "Tax . . . Liens." Aplts. App., Vol. 4 at 1313; *id.* Vol. 5 at 1429. Other search categories related to intimate personal information, such as "Romantic Preferences," "Personality traits," and "Rumors." *Id.* Vol. 4 at 1313; *id.* Vol. 5 at 1429.

Accusearch stresses on appeal that the search services offered on Abika.com were primarily services provided by third-party researchers, who were required by Accusearch to provide assurances that they would perform their work in accordance with applicable law. The researchers had no direct contact with Abika.com's customers. As Accusearch explains, "all information passed between [customer] and researcher went through Abika.com, as an intermediary." Aplts. Reply Br. at 3. In placing a search order, a customer paid Accusearch an "administrative search fee," Aplts. App., Vol. 4 at 1246, and selected the type of search desired, not a specific researcher or a search identified with a specific researcher. Accusearch would forward the search request to a researcher who could fulfill it. After completing a search, the researcher would send the results to Accusearch and bill Accusearch directly. Accusearch would then email the results to the customer and post them on the customer's Abika.com account. A customer

-4-

could know that a third-party researcher was involved in a transaction only by reading boilerplate contained on the website and in Accusearch's email correspondence. And even then, the customer was not provided contact information for any researcher.

## B. Provision of Telephone Records

From February 2003 to January 2006 the Abika.com website advertised access to personal telephone records. The website stated that its customers could acquire "details of incoming or outgoing calls from any phone number, prepaid calling card or Internet Phone," and that "Phone searchers are available for every country of the world." *Id.* Vol. 4 at 1246–47 (internal quotation marks omitted). Abika.com's customers could purchase both cellphone and landline records. The website specified that cellphone records would detail the numbers dialed from a particular cellphone and generally include the "date, time and duration of the calls" made. *Id.* Vol. 2 at 475. Landline records would include the same information, save for the specific time at which calls were made.

Acquisition of this information would almost inevitably require someone to violate the Telecommunications Act or to circumvent it by fraud or theft. The Act forbids telecommunications carriers from disclosing telephone records absent customer consent or the applicability of one of several exceptions. *See* 47 U.S.C. § 222(c)–(d). The Act provides as follows:

> Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

*Id.* § 222(c)(1). (We note the additional exceptions below.[1]) There is no dispute that the telephone records available on Abika.com constituted "individually identifiable customer proprietary network information" within the meaning of § 222,[2] or, more generally, that the Telecommunications Act barred disclosure of those records by telecommunications carriers. Although Accusearch (remarkably, in our view) maintained that it relied in good faith on its researchers' commitment to obey the law in acquiring information, it represented that it ceased offering

---

[1] The Act does not forbid telecommunications carriers from disclosing telephone records to (1) "initiate, render, bill, and collect for telecommunications services"; (2) protect telecommunications carriers and customers from the "fraudulent, abusive, or unlawful use of, or subscription to," telecommunications services; (3) provide certain "telemarketing, referral, or administrative services to the customer"; and (4) "provide call location information" to (a) public-safety personnel responding to a user's call, (b) legal guardians and family members in emergency situations involving "risk of death or serious physical harm," and (c) "providers of information or database management services" used to assist in the provision of emergency services. 47 U.S.C. § 222(d).

[2] "Customer proprietary network information" is defined to include "information contained in bills" and "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer." 47 U.S.C. § 222(h)(1).

telephone records in January 2006 after learning that a subsidiary of one of its researchers possibly obtained telephone data fraudulently.

### C.    Procedural History

The FTC filed suit against Accusearch on May 1, 2006, roughly four months after Accusearch ceased to offer telephone records.  The complaint alleged that telephone records are protected against disclosure by the Telecommunications Act and that trade in such records constitutes an unfair practice in violation of § 5(a) of the FTCA, 15 U.S.C. § 45(a).  Accusearch responded with a motion to dismiss, contending that the complaint failed to state a claim because the Telecommunications Act applies only to telephone carriers and because selling confidential telephone records was not otherwise unlawful.  The district court denied the motion and Accusearch filed an answer.  After conducting discovery the parties each moved for summary judgment.

The FTC argued that Accusearch's practices were unfair under the FTCA as a matter of law.  Accusearch countered that it was immunized by the CDA, which, broadly speaking, protects Internet services from liability as publishers with respect to content provided by others.  *See* 47 U.S.C. § 230(c).  Accusearch contended that it was entitled to this immunity because the FTC's claim treated it as the publisher of telephone records that were provided by others (that is, telephone companies and independent researchers) and traded over Abika.com.  The district court granted the FTC's motion and rejected Accusearch's assertion of

immunity. The court ruled that the FTC had established each element of its unfair-practice claim. And it concluded that Accusearch was not entitled to statutory immunity because it had "participated in the creation or development" of the information delivered to customers, *Accusearch*, 2007 WL 4356786, at *6 (brackets and internal quotation marks omitted), and because the FTC's claim did not "treat" Accusearch as a mere publisher of those records, *id.* at *5 (internal quotation marks omitted). It found that Accusearch's "claim of blissful ignorance [of its researchers' misconduct] is simply not plausible in light of the facts of this case," *id.* at *7, explaining that "[e]ven if [Accusearch was] unaware at the outset how these records were obtained, emails documenting the ordering process between Accusearch and its vendors clearly indicated that underhanded means were used to obtain the records," *id.* After further briefing the district court entered an injunction restricting Accusearch's future trade in telephone records and other personal information. Accusearch was also ordered, among other things, to disgorge $199,692.71 in profits from the sale of telephone-record information.

## D. Claims on Appeal

Accusearch contends that the district court should have granted judgment in its favor because (1) it broke no law, (2) the FTC acted outside its authority by attempting to enforce the Telecommunications Act, and (3) it was entitled to immunity under the CDA. Accusearch also challenges the propriety and scope of the injunction. Prohibitory injunctive relief was unnecessary, argues Accusearch,

because it voluntarily ceased dealing in telephone records before the FTC filed its complaint, and because resumption of those activities would subject it to newly enacted criminal sanctions regardless of the injunction. Accusearch further asserts that the injunction improperly restricts its ability to deal in consumer data other than telephone records. This overbreadth, we are told, violates Accusearch's due-process, free-speech, and equal-protection rights.

## II. DISCUSSION

### A. Unfair-Practice Claim

The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1), and vests the FTC with authority to prevent such practices by issuing cease-and-desist orders, *id*. § 45(b), by prescribing rules, *id*. § 57a(a)(1)(B), and by seeking injunctive relief in federal district court, *id*. § 53(b). To be "unfair," a practice must be one that "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." *Id.* § 45(n).

The FTC argued below that Accusearch's practice of offering consumer telephone records over the Internet satisfied all three requirements. First, the FTC contended that substantial injury was caused by the subversion of the Telecommunications Act; it argued that consumers whose telephone records were obtained through Abika.com suffered emotional harm (sometimes from being

stalked or otherwise harassed) and often incurred substantial costs in changing telephone providers to prevent future privacy breaches. Second, the FTC contended that because Accusearch's researchers could override password encryption, consumers could not protect themselves by reasonable means but only by extreme measures such as ceasing telephonic communication altogether. Third, the FTC contended that the unconsented-to disclosure of telephone records provided no countervailing benefits to consumers.

On appeal Accusearch does not challenge this analysis of the unfair-practice elements. Its arguments relate only to the FTC's reliance on the Telecommunications Act. One argument is that the FTC could not rely on the Act because it applied solely to telecommunications carriers, not to Accusearch or its researchers; during the period at issue,[3] contends Accusearch, there was "no law preventing a third-party from collecting telephone records." Aplts. Am. Br. at 61.

We reject the argument. Its premise appears to be that a practice cannot be an unfair one unless it violates some law independent of the FTCA. But the FTCA imposes no such constraint. *See* 15 U.S.C. § 45(n) (setting out elements of an unfair practice). On the contrary, the FTCA enables the FTC to take action against unfair practices that have not yet been contemplated by more specific laws. *See Spiegel, Inc. v. FTC*, 540 F.2d 287, 291–94 (7th Cir. 1976) (catalog retailer's

---

[3] After Accusearch ceased offering telephone records, Congress enacted the Telephone Records and Privacy Protection Act of 2006, which criminalizes the sale and receipt of confidential telephone records. *See* 18 U.S.C. § 1039.

practice of suing customers in distant forum was unfair even if practice was perfectly proper under state law); 1 Stephanie W. Kanwit et al., Federal Trade Commission § 4.5 (2008) (The FTC is "unfettered and free to proceed against practices not previously considered unlawful.").

To be sure, violations of law may be relevant to the unfairness analysis. *See* 15 U.S.C. § 45(n) ("In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."); Stephen Calkins, *FTC Unfairness: An Essay*, 46 Wayne L. Rev. 1935, 1970 (2000) (discussing FTC enforcement actions in which claim that practice was unfair was predicated on violation of a law other than the FTCA). Here, for example, the FTC alleged that the substantial-injury element of an unfair practice, *see* 15 U.S.C. § 45(n), was met partly by the subversion of consumer privacy protections afforded by the Telecommunications Act. But the existence of that injury turns on whether the Telecommunications Act was violated (by somebody), not on whether Accusearch could itself be held liable under the Telecommunications Act.

Accusearch also raises the related argument that the FTC had no authority to bring its claim because only the Federal Communications Commission may enforce the Telecommunications Act. This argument fundamentally misapprehends the nature of this lawsuit. The FTC brought suit under the Federal

Trade Commission Act, seeking to enjoin an unfair practice affecting commerce. *See id.* § 45(a) (declaring unfair practices unlawful); *id.* at § 53(b) (giving the FTC authority to seek enjoinment of unfair practices in federal district court). As set out above, the Telecommunications Act was relevant to that claim. But the complaint does not allege that Accusearch violated that Act. In any event, the FTC may proceed against unfair practices even if those practices violate some other statute that the FTC lacks authority to administer. *See Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 983 (D.C. Cir. 1985) (certain creditor remedies, which violated laws in a number of states, also unfair under § 5(a)). Indeed, condemnation of a practice in criminal or civil statutes may well mark that practice as "unfair." *See FTC v. R.F. Keppel & Bro.,* 291 U.S. 304, 313 (1934); *Am. Fin. Servs. Ass'n*, 767 F.2d at 983. By the same token, a practice, such as Accusearch's, which either encourages such condemned conduct or encourages the use of fraud or theft to circumvent the statute, may likewise be considered "unfair."

### B.    Immunity Under the Communications Decency Act

Accusearch's primary argument on appeal is that even if the FTC stated a claim, it is immune from liability under § 230(c)(1) of the CDA. *See* 47 U.S.C. § 230(c)(1). The CDA is intended to facilitate the use and development of the Internet by providing certain services an immunity from civil liability arising from content provided by others. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330–31

(4th Cir. 1997).  The prototypical service qualifying for this statutory immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others.  *See id.* at 328–29, 332 (discussing operation of messaging board and holding that it was "clearly protected by § 230's immunity").  Indeed, Congress enacted the CDA in response to a state-court decision*, Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710, *5 (N.Y. Sup. Ct. May 24, 1995), which held that the provider of an online messaging board could be liable for defamatory statements posted by third-party users of the board.  *See Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc) (noting Congress's concern about *Stratton Oakmont*).  The *Stratton Oakmont* court ruled that the administrator of the board became a "publisher" when it deleted some distasteful third-party postings, and thus was subject to publisher's liability for the defamatory postings it failed to remove.  1995 WL 323710, at *4–5.  The decision was criticized for discouraging the voluntary filtration of Internet content, because a forum provider's efforts to sanitize content would trigger liability that could be avoided by doing nothing.  *See Roommates.com*, 521 F.3d at 1163.

The CDA, however, does more than just overrule *Stratton Oakmont*.  To understand the full reach of the statute, we will need to examine some of the technical terms used in the CDA.  But to put those terms in context we first quote the operative provisions of the law.  Section 230(c)(1) provides as follows:

-13-

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

Section 230(c)(2), which protects services that filter content, states:

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). ["paragraph (1)" should probably be "subparagraph (A)," *see* U.S.C.A. § 230(c), n.1].

Finally, § 230(e)(3) provides that "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

Accusearch claims immunity under § 230(c)(1). The language of that provision, quoted above, sets three limits on the immunity provided. First, immunity is available only to a "provider or user of an interactive computer service." *Id*. § 230(c)(1). The term *interactive computer service* means

any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

*Id.* § 230(f)(2).  Second, the liability must be based on the defendant's having acted as a "publisher or speaker."  *Id.* at § 230(c)(1).  Third, immunity can be claimed only with respect to "information provided by another information content provider."  *Id.*  Accusearch contends that it satisfies these requirements.  If it fails to satisfy any one of the three, it is not entitled to immunity.

### 1. Interactive Computer Service

With respect to the first requirement for CDA immunity, the district court ruled that Accusearch provided an interactive computer service.  *See Accusearch*, 2007 WL 4356786, at *4.  The FTC argues on appeal that Accusearch did not provide such a service because its website "did not allow for any interaction between third parties."  Aplee. Br. at 20.  The FTC asserts that the CDA's legislative history and Congress's use of the word "interactive" evince an intent to protect only the providers of online bulletin boards.  It distinguishes such boards from a website like Accusearch's, which merely permits a user to conduct the same sort of business that it would in a retail store (or private investigator's office).  (We note, however, that the FTC's argument would also deny immunity to nonretail websites, such as one that posted medical-journal articles online (perhaps after removing graphic pictures), unless the website also permitted direct interaction among its visitors.)

Accusearch essentially concedes the factual premise of the FTC's argument— namely, the absence of direct interaction among users of the Abika.com website.  Although Accusearch occasionally tries to portray its website as an interactive forum on which independent researchers connected with persons seeking information, it ultimately acknowledges that "all information passed between the [customer] and researcher went through Abika.com, as an intermediary."  Aplts. Reply Br. at 3.

But despite the FTC's accurate characterization of Abika.com, its interactivity argument does not fully respect the CDA's text.  Section 230(f)(2) does not say that an interactive computer service must facilitate interaction among third parties; rather, it says that an interactive computer service is one that "provides or enables computer access by multiple users *to a computer server*."  47 U.S.C. § 230(f)(2) (emphasis added).  *See Universal Commc'ns Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ("web site operators . . . are providers of interactive computer services" because "[a] web site . . . enables computer access by multiple users to a computer server, namely, the server that hosts the web site." (internal quotation marks omitted)); *Batzel v. Smith*, 333 F.3d 1018, 1030 (9th Cir. 2003) (suggesting, but not deciding, that a website necessarily provides an interactive computer service).  Accordingly, we are reluctant to embrace the FTC's contention that one who operates a website does not thereby provide an interactive computer service unless it allows interaction

-16-

among the users.  Because we can resolve the matter of CDA immunity in this case
without deciding whether the FTC's contention is correct, we leave it to another
day.

### 2.    Treatment as a Publisher or Speaker

Turning to the second requirement for CDA immunity, we refrain from
adopting the concurrence's view that the CDA does not protect Accusearch
because Accusearch's liability under the FTCA is not based on its being a
publisher or speaker.  According to the concurrence, "the FTC sought and
ultimately held Accusearch liable for its *conduct* rather than for the *content* of the
information it was offering on the Abika.com website."  Op., (Tymkovich, J.,
concurring) at 2.  It appears to us, however, that Accusearch would not have
violated the FTCA had it not "published" the confidential telephone information
that it had improperly acquired.  And that publication was on its website.  It would
seem to be irrelevant that Accusearch *could have* operated the same business
model without use of the Internet.  The concurrence thoughtfully raises an
interesting point, but, as with the first requirement for CDA immunity, we choose
not to resolve the immunity issue on this ground.

### 3.    Information Content Provider

The predicate for CDA immunity on which we resolve the matter is the third
requirement.  A provider of an interactive computer service, such as Accusearch,
may claim CDA immunity only with respect to "information provided by another

-17-

information content provider." 47 U.S.C. § 230(c)(1). Thus, an interactive computer service that is also an "information content provider" of certain content is not immune from liability arising from publication of that content. *See Roommates.com*, 521 F.3d at 1162; *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 985 n.4 (10th Cir. 2000).

The CDA defines the term *information content provider* as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). "This is a broad definition, covering even those who are responsible for the development of content only 'in part.'" *Universal Commc'n Sys.*, 478 F.3d at 419. Accordingly, there may be several information content providers with respect to a single item of information (each being "responsible," at least "in part," for its "creation or development"). *See* 47 U.S.C. § 230(f)(3).

Accusearch contends that under the plain language of the CDA it was not an information content provider, because it was not responsible for creation or development of information. We disagree. To begin with, we consider whether confidential telephone records are "developed," within the meaning of the CDA, when, as here, they are sold to the public over the Internet.

The CDA does not define the term *development*. Accusearch would construe the word narrowly. It relies on two dictionary definitions, correctly

noting that *develop* can mean to "[m]ake something new" and "[c]ome into existence." Aplts. Am. Br. at 39 (internal quotation marks omitted). Because the information provided to its customers came originally from the telecommunications carriers, it argues, it made nothing new nor brought anything into existence. But the CDA uses the phrase "creation or development of information," 47 U.S.C. § 230(f)(3), and if the meaning of the word *develop* were limited to the two senses relied upon by Accusearch, the word *development* would add nothing not already conveyed by the word *creation*. "Under a long-standing canon of statutory interpretation, one should avoid construing a statute so as to render statutory language superfluous." *McCloy v. U.S. Dept. of Agric.*, 351 F.3d 447, 451 (10th Cir. 2003); *see Roommates.com*, 521 F.3d at 1168. We therefore examine whether we can reasonably construe *development* more broadly.

We can. When faced with an undefined statutory term, an investigation of its "core meaning" can be illuminating. *United States v. Montgomery*, 468 F.3d 715, 720 (10th Cir. 2006); *see also Muscarello v. United States*, 524 U.S. 125, 128–29 (1998) (investigating etymological origins of "carries" to uncover its "primary meaning"). The word *develop* derives from the Old French *desveloper*, which means, in essence, to unwrap. Webster's Third New International Dictionary 618 (2002) (explaining that *desveloper* is composed of the word *veloper*, meaning "to wrap up," and the negative prefix *des*). The dictionary definitions for *develop* correspondingly revolve around the act of drawing

something out, making it "visible," "active," or "usable." *Id*. Thus, a photograph is developed by chemical processes exposing a latent image. *See id*. Land is developed by harnessing its untapped potential for building or for extracting resources. *See id*. Likewise, when confidential telephone information was exposed to public view through Abika.com, that information was "developed." *See id.* (one definition of *develop* is "to make actually available or usable (something previously only potentially available or usable)").

This conclusion, however, does not end the inquiry. The question remains whether Accusearch was "'responsible, in whole or in part, for the . . . development of' the offending content." *Roommates.com*, 521 F.3d at 1162 (quoting § 230(f)(3)). That is, was it responsible for the development of the specific content that was the source of the alleged liability? The answer is "yes."

Just as the CDA does not define *development*, it does not define *responsible*. We need not provide a complete definition of the term that will apply in all contexts; but we can say enough to resolve this case and to assuage concern that the broad meaning for *development* that we have adopted will undermine the purpose of immunity under the CDA.

The meaning of *responsible* becomes an issue under the CDA when a court is considering whether CDA immunity from liability is unavailable because one is "responsible, in whole or in part, for the creation or development of information" that is the source of the liability. In this context—responsibility for harm—the

word *responsible* ordinarily has a normative connotation. *See* The Oxford English Dictionary 742 (2d ed. 1998) (stating one definition of *responsible* as "Morally accountable for one's actions."). As one authority puts it: "[W]hen we say, 'Every man is *responsible* for his own actions,' we do not think definitely of any authority, law, or tribunal before which he must answer, but rather of the general law of right, the moral constitution of the universe. . . ." James C. Fernald, Funk & Wagnalls Standard Handbook of Synonyms, Antonyms, and Prepositions 366 (1947). Synonyms for *responsibility* in this context are *blame*, *fault*, *guilt*, and *culpability*. *See* Oxford American Writer's Thesaurus 747 (2d ed. 2008). Accordingly, to be "responsible" for the development of offensive content, one must be more than a neutral conduit for that content. That is, one is not "responsible" for the development of offensive content if one's conduct was neutral with respect to the offensiveness of the content (as would be the case with the typical Internet bulletin board). We would not ordinarily say that one who builds a highway is "responsible" for the use of that highway by a fleeing bank robber, even though the culprit's escape was facilitated by the availability of the highway.

This construction of the term *responsible* comports with the clear purpose of the CDA—to encourage Internet services that increase the flow of information by protecting them from liability when independent persons negligently or intentionally use those services to supply harmful content. *See* 47 U.S.C. § 230(a),

(b).  We therefore conclude that a service provider is "responsible" for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content.

In the case before us, the offending content was the disclosed confidential information itself.  We need not construe the word *responsible* to extend beyond its core meaning in this context to conclude that Accusearch was responsible for the development of that content—for the conversion of the legally protected records from confidential material to publicly exposed information.  Accusearch solicited requests for such confidential information and then paid researchers to obtain it.  It knowingly sought to transform virtually unknown information into a publicly available commodity.  And as the district court found and the record shows, Accusearch knew that its researchers were obtaining the information through fraud or other illegality.

Accusearch argues that our decision in *Ben Ezra*, 206 F.3d 980, establishes its entitlement to CDA immunity.  In that case the plaintiff corporation sued America Online for allegedly posting on three occasions incorrect information concerning the corporation's stock price and share volume.  *Id*. at 983.  America Online purchased price and volume information on numerous stocks from a third-party vendor who had compiled it from "major national and international stock exchanges and stock markets."  *Id*.  We held that America Online was protected from liability by the CDA.  *Id*. at 986.  Most relevant to this case, we said that

"Plaintiff has not demonstrated [that America Online] worked so closely with [the third-party vendor] regarding the allegedly inaccurate stock information that [it] became an information content provider." *Id.* at 985. Accusearch argues that because America Online was not considered an information content provider despite soliciting the relevant information for online publication, Accusearch's own solicitation of information could not make it an information content provider either. But Accusearch takes too broad a view of what was the relevant information in *Ben Ezra*. Although America Online solicited stock quotations, the plaintiff's claim was based on *inaccuracies* in the solicited quotations. *See id.* at 983. The "offending content" was thus erroneous stock quotations and, unsurprisingly, America Online did not solicit the errors; indeed, it sent the vendor emails requesting that it "correct the allegedly inaccurate information." *Id.* at 985. If the information solicited by America Online had been inherently unlawful—for example, if it were protected by contract or was child pornography—our reasoning would necessarily have been different. In *Ben Ezra*, however, America Online had done nothing to encourage what made the content offensive—its alleged inaccuracy. America Online's conduct was neutral with respect to possible errors in the stock quotations. It was therefore not *responsible* for the offensive content.

Our holding that Accusearch was an information content provider is supported by authority from outside this circuit. Most recently, the Ninth Circuit, sitting en banc, held that the provider of an online roommate-matching service was

-23-

responsible for the development of discriminatory preferences contained in its users' personal-profile pages. *Roommates.com*, 521 F.3d at 1167–68. Subscribers of the website were required to specify from a set of preselected answer choices their "sex, sexual orientation and whether [they] would bring children to a household." *Id.* at 1161; *see id.* at 1165 & n.17. Subscribers also had to select their "preferences in roommates with respect to the same three criteria." *Id.* at 1161. For example, subscribers seeking housing had to state "whether they [were] willing to live with 'Straight or gay' males, only with 'Straight' males, only with 'Gay' males or with 'No males.'" *Id.* at 1165. These preferences were then posted on a subscriber's profile page, where they could be reviewed by other subscribers looking for a roommate match. *Id.* To be sure, the matching service did not place discriminatory preferences in the minds of its users. It did not, in other words, create those preferences. But the court found that by requiring its users to disclose their illicit preferences, the service provider became "much more than a passive transmitter of information provided by others; it bec[ame] the developer, at least in part, of that information." *Id.* at 1166. It summarized: "[A] website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Id.* at 1168.

That language applies to Accusearch's role in this case. By paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, it contributed mightily to the unlawful conduct of its

researchers. Indeed, Accusearch's responsibility is more pronounced than that of Roommates.com. Roommates.com may have encouraged users to post offending content; but the offensive postings were Accusearch's *raison d'etre* and it affirmatively solicited them.

An earlier Ninth Circuit case, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), provides a useful comparison. In that case an unknown person created a bawdy dating profile for actress Christianne Carafano on the defendant's online-dating website. *See id.* at 1121. To create the profile, the anonymous poster had to draft an essay and "select answers to more than fifty questions from menus providing between four and nineteen options." *Id.* Some options were "sexually suggestive" and some were "innocuous." *Id.* The Ninth Circuit held that the dating service was not an information content provider of the libelous profile. *Id.* at 1124. As the en banc court would later explain in *Roommates.com*, "[t]he salient fact in *Carafano* was that the website's classifications of user characteristics did absolutely nothing to enhance the defamatory sting of the message, to encourage defamation or to make defamation easier." *Roommates.com*, 521 F.3d at 1172. Although an unknown person created Ms. Carafano's profile in part from preselected answer choices, the menus provided by the website did not encourage a defamatory response. *See id.* at 1171. Unlike Roommates.com, which prompted the disclosure of discriminatory preferences, the dating website provided only "neutral tools" which were

-25-

employed to create the offending content. *Id.* at 1172; *see Universal Commc'n Sys.*, 478 F.3d at 420 (messaging board immune with respect to posts it did not prompt); *cf. Chi. Lawyers' Comm.*, 519 F.3d at 671 (Craigslist did not "cause" discriminatory housing advertisements within the meaning of the Fair Housing Act, 42 U.S.C. § 3604(c), by hosting online marketplace where they were posted).

Accusearch attempts to portray itself as the provider of neutral tools, stressing that it merely provided "a forum in which people advertise and request" telephone records. Aplts. Am. Br. at 37–38. But that phrasing mischaracterizes the record. As explained above, Accusearch solicited requests for confidential information protected by law, paid researchers to find it, knew that the researchers were likely to use improper methods, and charged customers who wished the information to be disclosed. Accusearch's actions were not "neutral" with respect to generating offensive content; on the contrary, its actions were intended to generate such content. Accusearch is not entitled to immunity under the CDA.

### C.    The Injunction

The FTCA provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Although Accusearch ceased dealing in telephone records before the FTC filed its complaint, the district court determined that prospective injunctive relief was appropriate to prevent Accusearch from engaging in similar unfair practices with respect to telephone records or the other information it provided.

*Accusearch*, 2007 WL 4356786, at *9. Accordingly, the injunction prohibits

Accusearch from doing, among other things, the following:

> (1)    Trading in "customer phone records" unless doing so would be "clearly permitted by any law, regulation, or lawful court order," Aplts. App., Vol. 5 at 1607; and

> (2)    Trading in other "consumer personal information without the express written permission of [the consumer], unless [the] consumer personal information was lawfully obtained from publically available information," *id.* at 1608.

The injunction defines *consumer personal information* as "any individually

identifiable information concerning a consumer." *Id*. at 1606.

Accusearch attacks these prohibitions on two grounds, arguing that they are

(1) unnecessary and (2) unconstitutionally overbroad. Accusearch does not

challenge other aspects of the relief ordered, including the provision requiring it to

disgorge $199,692.71 in profits garnered from the sale of telephone records. We

address Accusearch's contentions in turn.

## 1.    Propriety of Injunctive Relief

A "court's power to grant injunctive relief survives the discontinuance of

the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

When, as in this case, a defendant has ceased offending conduct, the party seeking

injunctive relief must demonstrate to the court "that there exists some cognizable

danger of recurrent violation, something more than the mere possibility which

serves to keep the case alive." *Id*. In assessing the likelihood of recurrence, a

court may consider "all the circumstances," including the "bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id.* We review the decision to grant a permanent injunction for abuse of discretion. *John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1142 (10th Cir. 2008). The district court's discretion in this context is "necessarily broad and a strong showing of abuse must be made to reverse it." *W. T. Grant Co.*, 345 U.S. at 633.

Accusearch has not persuaded us that the district court abused its discretion. True, Accusearch ceased offering telephone records before litigation commenced. But, as the district court noted, because Accusearch remained in the "information brokerage business" it had the capacity to "engag[e] in similar unfair acts or practices" in the future. *Accusearch*, 2007 WL 4356786, at *9; *see also W.T. Grant Co.*, 345 U.S. at 633 ("effectiveness of the discontinuance" is a factor in assessing likelihood of recurrence). In Accusearch's view it has proved the absence of any need for prospective relief by expressing a willingness to disgorge nearly $200,000 in ill-gotten profits. But a district court is best situated to judge the sincerity of a litigant's contrition, *see W.T. Grant Co.*, 345 U.S. at 634, and Accusearch has given us no ground to second-guess the district court's judgment. *See United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952) (courts must "beware of efforts to defeat injunctive relief by protestations of repentance and reform").

Accusearch also argues that the injunction was improper because 18 U.S.C. § 1039, enacted by Congress after this suit was filed, criminalizes the sale and receipt of confidential telephone records absent customer consent. *Id.* § 1039(a)–(c) (Supp. 2008). Stressing that the government could prosecute under § 1039 if it resumed its trade in telephone records, Accusearch asserts that prospective injunctive relief would be redundant, and, as such, improper, because a proper injunction must "'enhance the already existing power of the Government to act.'" Aplts. Am. Br. at 49 (quoting *New York Times Co. v. United States*, 403 U.S. 713, 744 (1971) (Marshall, J., concurring)).

To be sure, injunctions against criminalized conduct have historically been disfavored. *See Nat'l Ass'n of Letter Carriers v. Indep. Postal Sys. of Am., Inc.*, 470 F.2d 265, 271 (10th Cir. 1972). But in keeping with the characteristic flexibility of equitable remedies, they have never been absolutely prohibited. *See id.* An injunction can have several advantages over the threat posed by a criminal statute. To begin with, it can encompass conduct not barred by the statute. Here, the injunction covers all "individually identifiable" consumer information, Aplts. App., Vol. 5 at 1606, whereas the criminal statute covers only telephone records, *see* 18 U.S.C. § 1039(a)–(c), (h)(1). Also, because an injunction can be drawn more precisely than a criminal statute, it can have a greater deterrent effect by removing any doubt in the mind of the enjoined party that particular conduct is forbidden. Furthermore, proving a violation of an injunction is generally less

burdensome than proving a criminal violation. For example, to violate § 1039 one must act "knowingly and intentionally." *Id*. § 1039(a)–(c). The injunction, on the other hand, imposes no scienter requirement and the law does not necessarily imply one. *See FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005) ("FTC need not prove scienter . . . to establish a § 5 violation."); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2960, at 382 (2d ed. 1995) ("[A] violation of [a] decree need not be willful for a party to be held in civil contempt."). And a violation need not be proved to a jury beyond a reasonable doubt. *See* Charles Alan Wright, *supra* § 2960, at 379–80 (there is no constitutional right to a jury in civil-contempt proceedings and the contempt must be shown only by clear and convincing evidence, not beyond a reasonable doubt). The district court did not impose an inconsequential injunction. Thus, Accusearch's argument fails on its own terms.

In any event, "Congress . . . has power to provide for civil injunctive relief against activities which adversely affect interstate commerce, and that power extends to activities which are made criminal by state or federal law." *United States v. Cappetto*, 502 F.2d 1351, 1356 (7th Cir. 1974) (upholding injunction against gambling activities issued under the Organized Crime Control Act of 1970, which also made those activities a crime); *accord Nat'l Ass'n of Letter Carriers*, 470 F.2d at 271 (injunction against criminalized conduct proper in part because it was authorized by statutes "purely civil in nature"). In enacting the FTCA,

-30-

Congress gave the FTC express authority to seek permanent injunctive relief in federal court to prevent violations of § 5(a).  *See* 15 U.S.C. §53(b); *FTC v. Kuykendall*, 371 F.3d 745, 749, 764 (10th Cir. 2004) (en banc).

In sum, the enactment of § 1039 does not undermine the propriety of the injunction against Accusearch.

### 2.     Breadth of the Injunction

Although the district court determined only that Accusearch's trade in telephone records was unfair within the meaning of the FTCA, it issued an injunction restricting Accusearch's trade in "any individually identifiable information concerning a consumer."  Aplts. App., Vol. 5 at 1606.  Accusearch argues that the injunction should have been limited to its trade in telephone records, the specific practice found to be unlawful.  *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394–95 (1965) (FTC may "fence in" offenders by enjoining more than the specific misconduct previously engaged in, but the injunction must bear a "reasonable relation to the unlawful practices found to exist.").  According to Accusearch, this overbreadth violates its due-process, free-speech, and equal-protection rights.  (Because Accusearch's discussion of equal protection does not reference any particular feature of the injunction, we presume that the claim is tied to the only feature that Accusearch challenges on appeal—namely, its coverage of information other than telephone records.)

Accusearch, however, not only failed to preserve this claim of error below, it invited the alleged error. After the district court granted the FTC summary judgment, the parties submitted briefs on the propriety and scope of injunctive relief. Accusearch argued that an injunction was unnecessary and that, if the court disagreed, injunctive relief should be limited in certain respects. In connection with this alternate argument, Accusearch submitted a proposed injunctive order that had been "negotiated" with the FTC. Aplts. App., Vol. 5 at 1409. The proposed injunction set forth agreed-upon language and denoted several areas in which the parties could not reach consensus. Among the agreed-upon provisions were Section II, entitled "Prohibited Business Activities," which bars dealings in "consumer personal information," and the definition of that term as "any individually identifiable information concerning a consumer." *FTC v. Accusearch, Inc.*, No. 06-CV-105-D (Defs. Br. on Injunctive Relief, Ex. A at 2–5, Nov. 19, 2007).

Curiously, Accusearch submitted the proposed injunction as an attachment to a district-court brief in which it argued that the injunctive relief sought by the FTC would be overbroad because it was not limited to telephone records but covered "*all* consumer information." Aplts. App., Vol. 5 at 1411. That is, Accusearch appeared to object to provisions to which it had stipulated, perhaps indicating a clerical error or a drafting oversight. The FTC's responding brief took note of this inconsistency and reminded Accusearch that it had specifically

agreed to those provisions extending the injunction's coverage beyond telephone records. In reply, Accusearch made no effort to clarify its position or retract any stipulation in the proposed order. With no reason to doubt the stipulated language, the district court understandably adopted it verbatim.

The invited-error doctrine "precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt." *United States v. Deberry*, 430 F.3d 1294, 1302 (10th Cir. 2005). Thus, a party whose proposed order is entered as a judgment may not challenge errors within it on appeal. *See Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1072 (10th Cir. 2008). The doctrine applies in this case to bar Accusearch from challenging language that it proposed jointly with the FTC. *See Lyles v. Am. Hoist & Derrick Co.*, 614 F.2d 691, 694 (10th Cir. 1980) ("rulings of a trial court in accordance with stipulations that are clear and unambiguous will not be considered erroneous on appeal"). Accordingly, Accusearch's due-process, free-speech**,** and equal-protection arguments, which are premised on the breadth of the injunction, are waived and fail.

## III.  CONCLUSION

We AFFIRM the judgment of the district court.

**08-8003,** *F.T.C. v. Accusearch Inc. DBA Abika.com & Jay Patel*

**Tymkovich, J., concurring.**

I write separately to emphasize what I see as an unnecessary extension of the CDA's terms "responsible" and "development," thereby widening the scope of what constitutes an "information content provider" with respect to particular information under the Act.  *See* 47 U.S.C. § 230(c)(1), (f)(3).

The majority holds that by soliciting third-parties to obtain and then exposing the confidential telephone records to public view, Accusearch is *responsible*—at least in part—for *developing* that information.  Under this definition, the line between passive posting of tortious or unlawful commentary, news articles, or other previously unpublished information and content development depends on an amorphous analysis of the motivations of the content provider in soliciting or acquiring that information.  In the majority's view, a content provider seeking out the information in good faith may be able to obtain CDA immunity for any subsequent liability, as it would not have been "responsible, in whole or in part, for the . . . development of [that] information." § 230(f)(3).  If the provider's motivations are not in good faith, however, the majority's approach transforms the provider into a developer of that information. The provider would then be deemed the information content provider for that information and lose its entitlement to CDA immunity.  Instead of embarking on this path, I would avoid the need to interpret the CDA in the first instance.

I agree with the majority that Accusearch violated the FTCA, though I reach this conclusion because I believe the FTC sought and ultimately held Accusearch liable for its *conduct* rather than for the *content* of the information it was offering on the Abika.com website.  Section 230 only immunizes publishers or speakers for the *content* of the information from other providers that they make public.  § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.").  The CDA says nothing about immunizing publishers or speakers for their own conduct in *acquiring* the information.  Indeed, other courts have explicitly recognized this distinction.  *E.g.*, *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) ("[I]mmunity under the Act applies to any cause of action that would make service providers liable for information originating with a third-party user of the service.  Immunity does not seem to fit here because the alleged fraud is the use of the trademark name in the bidding process, and not solely the information from third parties that appears on the search results page.  It is not the purpose of the Act to shield entities from claims of fraud and abuse arising from their own pay-for-priority advertising business, rather than from the actions of third parties."); *Mazur v. eBay Inc.*, No. C 07-03967 MHP, 2008 WL 618988, at *9, 12 (N.D. Cal. Mar. 4, 2008) ("The CDA does not immunize [a content provider] for its own fraudulent misconduct. . . . [Here,] eBay's statement regarding safety affects and creates an expectation

regarding the procedures and manner in which the auction is conducted and
consequently goes beyond traditional editorial discretion.").

A recent Ninth Circuit case succinctly summed up the scope of Section 230
immunity with respect to various torts, stating:

> [W]hat matters is whether the cause of action inherently requires the
> court to treat the defendant as the "publisher or speaker" of content
> provided by another. To put it another way, courts must ask whether the
> duty that the plaintiff alleges the defendant violated derives from the
> defendant's status or conduct as a "publisher or speaker." If it does,
> section 230(c)(1) precludes liability.

*Barnes v. Yahoo!, Inc.*, 565 F.3d 560, 566 (9th Cir. 2009).

To make clear how the FTC sought to hold Accusearch liable, a quick
review of Accusearch's *conduct* is helpful. Through its Abika.com website,
Accusearch offered paying consumers the opportunity to obtain private
confidential telephone records of almost any individual with a cellular or landline
telephone. To fulfill a consumer's request for such information, Accusearch
would solicit and ultimately enlist various third-party "researchers" to "dig up"
these confidential records. These third-party "researchers" would use various
fraudulent or unlawful means to obtain these records from telecommunications
carriers in violation of the Telecommunications Act, § 222. The "researchers"
would then sell the records to Accusearch.

In its complaint, the FTC expressly addressed the *conduct* for which it
sought to hold Accusearch liable. In particular, using Section 5(a) of the FTC Act,

-3-

15 U.S.C. § 45(a), the FTC contended Accusearch "surreptitiously obtain[ed] and

s[old] confidential customer phone records without the customer's knowledge or

authorization."   Aplt. App., Vol. I at 19 ¶ 1.   In reference to Accusearch's

business model, the FTC noted that "[f]or a fee, Defendants have offered to obtain

'Details of incoming or outgoing calls from any phone number, prepaid calling

card or Internet Phone.  Phone searches are available for every country of the

world.'"  *Id.* at 21 ¶ 9.  Further, and most importantly, the FTC alleged (and

ultimately proved):

> The account holders have not authorized the Defendants to obtain access
> to or sell their confidential customer phone records.  Instead, to obtain
> such information, *Defendants have used, or caused others to use, false*
> *pretenses, fraudulent statements, fraudulent or stolen documents or*
> *other misrepresentations, including posing as a customer of a*
> *telecommunications carrier, to induce officers, employees, or agents of*
> *telecommunications carriers to disclose confidential customer phone*
> *records. Defendants have sold the confidential customer phone records*
> *that they have obtained to their clients.*

*Id.* at 21–22 ¶ 10 (emphasis added).[4]  As its cause of action against Accusearch,

the FTC claimed "Accusearch violated the FTCA by 'directly or through their

employees or agents, . . . obtain[ing] and s[elling] to third parties confidential

---

[4]  To satisfy the injury prong for FTCA liability, the FTC claimed the
"invasion of privacy and security resulting from obtaining and selling confidential
customer phone records without the consumers' authorization causes substantial
harm to consumers and the public, including, but not limited to, endangering the
health and safety of consumers."  *Id.* at 22 ¶ 11.

customer proprietary network information without the knowledge or consent of the customer.'" *Id.* at 22 ¶ 12.

As is clear from the complaint, the FTC's allegations of FTCA violations stemmed not from the *content* of the information Accusearch was disclosing (or developing), but from Accusearch's own *conduct* in (1) offering the information for sale, (2) soliciting and encouraging third-parties to violate the law in obtaining the information, and (3) ultimately paying these third parties and selling the information to consumers. Accusearch's duty to refrain from engaging in these unfair business practices does not derive from its status or conduct as an Internet website that publishes content.[5] Rather, the duty the FTC alleged Accusearch violated derives from the expectations that a business would not engage in unlawful or unfair business practices in general (whether the business is a conventional bricks-and-mortar operation or exists entirely on the World Wide Web). *See Barnes*, 565 F.3d at 566. While Internet publication of the confidential phone data, by itself, may very well be protected by the CDA, the CDA does not immunize, expressly or implicitly, the manner in which Accusearch conducted its

---

[5] If Accusearch had run a traditional business out of a physical location and offered similar services, it would seem the FTC would have the same unfair business practices complaint. Nothing would immunize Accusearch's conduct had it chosen to deliver the confidential telephone records to requesters through hard copy print-outs either in person or through the mail. Accusearch's duty to refrain from engaging in the solicitation and distribution of unlawfully-obtained confidential telephone records should not depend on the medium within which it chooses to operate.

business.  In sum, the CDA does not extend to immunize a party's conduct outside the realm of the Internet just because it relates to the publishing of information on the Internet.

Rather than follow the majority's disposition of this issue—extending the definitions of "responsible" and "develop" to include solicitation of information based on consumer selections off of Accusearch's website—I would limit the analysis to whether the CDA even applies in the first place.  I would conclude that it does not, and that Accusearch therefore was liable for its unfair business practices in violation of the FTCA.

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT
# OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

June 29, 2009

Douglas E. Cressler
Chief Deputy Clerk


Deborah Lynn Roden
Gay Woodhouse
Gay Woodhouse Law Office
211 West 19th Street Suite 308
Cheyenne, WY 82001


**RE:**   **08-8003, FTC v. Accusearch Inc., et al**
          Dist/Ag docket: 2:06-CV-00105-WFD

Dear Counsel:

Enclosed is a copy of the opinion of the court in the captioned case. Judgment was
entered today.

Please contact this office if you have questions.

                                    Sincerely,

                                    *Elisabeth A. Shumaker*

                                    Elisabeth A. Shumaker
                                    Clerk of the Court


cc:     John F. Daly
        Lawrence DeMille-Wagman
        Edward R. McNicholas
        Carol A. Statkus
        Tracy S. Thorleifson
        Kial S Young


EAS/ng

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

August 21, 2009

Douglas E. Cressler
Chief Deputy Clerk

Stephan Harris
United States District Court for the District of Wyoming
Office of the Clerk
2120 Capitol Avenue, Room 2141
Cheyenne, WY 82001-0000

**RE:**     **08-8003, FTC v. Accusearch Inc., et al**
        Dist/Ag docket: 2:06-CV-00105-WFD

Dear Clerk:

Please be advised that the mandate for this case has issued today. Please file accordingly in the records of your court or agency.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker

Elisabeth A. Shumaker
Clerk of the Court

cc:     John F. Daly
        Lawrence DeMille-Wagman
        Edward Robert McNicholas
        Deborah Lynn Roden
        Carol A. Statkus
        Tracy S. Thorleifson
        Gay Woodhouse
        Kial S Young

EAS/ng